Jason D. Boren (#7816)
Nathan R. Marigoni (#14885)
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, Utah 84111-2221
Telephone: (801) 531-3000
Facsimile: (801) 531-3001
borenj@ballardspahr.com
marigonin@ballardspahr.com

*Attorneys for Plaintiff Parcel Partners, LLC*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **PARCEL PARTNERS, LLC, a Utah Limited Liability Company,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**SHOPIFY INC., a Canadian company,**<br><br>**Defendant.** | **MEMORANDUM IN OPPOSITION TO DEFENDANT SHOPIFY INC.'S MOTION TO DISMISS THE COMPLAINT**<br><br>**Case No.: 2:20-cv-00253-DB-DOA**<br><br>**Judge Dee Benson**<br>**Magistrate Judge Daphne A. Oberg** |

Plaintiff Parcel Partners, LLC ("Parcel Partners") hereby responds to and opposes the Motion to Dismiss the Complaint (the "Motion") filed by Defendant Shopify Inc. ("Defendant"). For the reasons stated herein, Parcel Partners respectfully requests that the Motion be denied in its entirety.

**INTRODUCTION**

The present action consists of a straightforward breach of contract claim. Defendant, a multinational e-commerce company providing merchants with online and mobile storefronts to sell products and services, contracted with Parcel Partners, a company that offers customers discounted USPS shipping rates. Pursuant to the terms of the parties' contract, and the applicable amendments thereto, Parcel Partners agreed to offer Defendant discounted shipping rates for three years. However, prior to the agreement's expiration, Defendant notified Parcel Partners that it had negotiated its own agreement with the USPS for discounted domestic shipping rates and stopped referring its merchants to Parcel Partners in breach of its obligations under the parties' agreement. As a result, Parcel Partners has incurred significant damages.

Defendant does not dispute the existence of an enforceable contract between the parties, the material terms of the agreement, Parcel Partners' performance of its obligations under the agreement, or that Parcel Partners incurred damages. Instead, Defendant only contends that it did not breach the parties' agreement because the agreement allegedly does not contain express language creating an exclusive relationship with Parcel Partners for the offer of domestic shipping rates. Defendant's argument is without merit because it relies on an interpretation of the agreement that would impermissibly create an illusory promise, as Defendant could terminate the agreement at any time by simply ceasing to refer its customers to Parcel Partners for domestic shipping rates while at the same time avoiding the consequences of the parties' early termination clause. The parties' agreement does not expressly indicate that Parcel Partners intended these results, and such a result would be unreasonably harsh. Moreover, the agreement,

read as a whole, requires exclusivity. For these reasons, Defendant's Motion should be dismissed.

## MATERIAL FACTS

1. Defendant is a multinational e-commerce company that provides merchants with online and mobile storefronts to sell their products and services. (Compl. ¶ 9.)

2. Defendant's e-commerce platform provides its merchants with, among other things, the ability to process payments and ship their orders. (*Id.* at ¶ 10.)

3. Parcel Partners offers customers such as Defendant discounted shipping rates through its Negotiated Service Agreement ("NSA") with the United States Postal Service. (*Id.* at ¶ 11.)

4. On or about April 1, 2017, Parcel Partners and Defendant entered into a Referral Agreement (the "Agreement"), attached to the Complaint as Exhibit 1.[1] (*Id.* at ¶ 12.)

5. Pursuant to the Agreement, Parcel Partners agreed to offer Defendant USPS shipping rate discounts as specified in "Schedule B—Referral Source Percentage Discount off Lowest USPS Published Rates." (*Id.*)

6. The Agreement provided for an initial term of one year, which commenced on April 1, 2017, and would renew for two additional one year terms unless either Parcel Partners or Defendant provided sixty days' written notice of its intention not to renew prior to the expiration of the initial term or any renewal term. (*Id.* at ¶ 15.)

[1] By Order dated April 22, 2020, this Court granted Parcel Partners' "*Ex Parte* Motion for Leave to Seal Exhibits [1] and [2] to the Complaint." [Dkt. No. 10.]

7. Pursuant to the Agreement, Parcel Partners resells its USPS discounted shipping rates to Defendant's merchants that Defendant refers to Parcel Partners. (*Id.* at ¶ 16.)

8. Pursuant to Section 1(E) of the Agreement: "Where the domestic rates offered by [Parcel Partners] pursuant to Exhibit B are discounted off the USPS' publically available domestic rates, [Defendant] will not offer [merchants] any alternative domestic rate offer from a Competing Reseller." (*Id.* at § 1(E).) (*Id.* at ¶ 17.)

9. The Agreement defines "Competing Reseller" as "a third party, other than [Defendant], that offers shipping rates under negotiated service agreements directly with the USPS for domestic or international rates. (*Id.*) (*Id.* at ¶ 18.)

10. By its terms, and when viewed in the context of the Agreement as a whole, Section 1(E) creates an exclusive relationship between Parcel Partners and Defendant for the offer of domestic shipping rates because it prohibits Defendant from offering its customers domestic shipping rates from Competing Resellers. (*Id.* at ¶ 19.)

11. This exclusive relationship arises because the broad definition of "Competing Reseller" encompasses two categories of resellers: (1) resellers of USPS rates, similar to Parcel Partners' relationship to Defendant under the Agreement, and (2) other parties that offer shipping rates pursuant to a reseller's NSA. (*Id.* at ¶ 20.)

12. The Agreement carves out Defendant from the definition of "Competing Reseller" because Defendant would otherwise fall under the second category of resellers under of Section 1(E) of the Agreement by providing shipping rates to its customers under Parcel Partners' NSA. (*Id.* at ¶ 21.)

13. However, the definition of "Competing Reseller" refers to "negotiated service agreements with the USPS" and makes no distinction regarding the party holding the NSA. (*Id.* at ¶ 22.)

14. Therefore, the Agreement prohibited Defendant from obtaining its own NSA with the USPS and referring its merchants to Defendant's discounted domestic shipping rates. (*Id.* at ¶ 23.)

15. This exclusive relationship becomes even clearer when Section 1(E) is viewed in the context of the Agreement as a whole. (*Id.* at ¶ 24.)

16. For example, Section 2(E) of the Agreement expressly permits Defendant to offer its merchants "competing products and offerings from Competing Resellers, or directly from the USPS, for: (i) international USPS rates, (ii) international USPS rates that include a USPS domestic rate as a component of the international USPS rate, (iii) domestic USPS rates on first class parcels." (*Id.* at § 2(E).) (*Id.* at ¶ 25.)

17. Additionally, the Agreement's amending language further supports the existence of an exclusive relationship. (*Id.* at ¶ 26.)

18. On April 1, 2019, the Agreement was amended by the Second Amending Agreement ("Amendment No. 2"), attached to the Complaint as "**Exhibit 2**."[2] (*Id.* at ¶ 27.)

19. In addition to other revisions and additions, including but not limited to a revised "Schedule B—Referral Source Percentage Discount off Lowest USPS Published Rates," Amendment No. 2 added Section 10B: "Termination for Convenience." (*Id.* at ¶ 28.)

[2] For the same reasons stated in Footnote 1, *supra*, Exhibit 2 has been filed under seal with the permission of this Court.

20. The Termination for Convenience clause permits Defendant to terminate the Agreement for convenience "upon at least ninety (90) days advance written notice to [Parcel Partners]." (*Id.* at ¶ 29.)

21. Moreover, pursuant to the Termination for Convenience Clause:

> In the event [Defendant] exercises its right to terminate for convenience pursuant to this Section 10B, [Defendant] agrees to provide [Parcel Partners] with a lump sum payment equal to six hundred and fifty thousand ($650,0000 (the "Termination Payment"). If applicable, [Defendant] will pay [Parcel Partners] the Termination Payment at least thirty (30) days prior to the date the Agreement is terminated. The Parties intent that the Termination Payment constitute compensation, and not a penalty. The [Defendant's] payment of the Termination Payment is the [Defendant's] sole liability and entire obligation and [Parcel Partner's] exclusive remedy for any termination arising pursuant to this Section 10B.

(Amendment No. 2, § 10B.) (*Id.* at ¶ 30.)

22. The Termination for Convenience Clause would be unnecessary if no exclusive relationship existed between Defendant and Parcel Partners for offering domestic shipping rates, as Defendant could slowly move its domestic volume off of Parcel Partners' NSA without consequence. (*Id.* at ¶ 31.)

23. On or about February 3, 2020, Defendant informed Parcel Partners that it had secured its own domestic NSA with the USPS. (*Id.* at ¶ 32.)

24. On or about February 21, 2020, Defendant stopped referring its merchants to Parcel Partners for its discounted shipping rates, despite the fact that the Agreement was not due to expire until March 31, 2020. (*Id.* at ¶ 33.)

25. Parcel Partners has, at all times, honored the Agreement and arranged for domestic shipping services to Defendant at the specified rates subject to the Agreement. (*Id.* at ¶ 34.)

26. On or about March 6, 2020, Parcel Partners notified Defendant that its actions were a breach of the exclusivity provisions of the Agreement. (*Id.* at ¶ 35.)

27. Defendant refused, failed, and neglected to cure its breach of the Agreement. (*Id.* at ¶ 36.)

28. Parcel Partners has suffered damages as a result of Defendant's breach in an amount no less than $5,000,000.[3] (*Id.* at ¶ 43.)

**ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief, accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

[3] Defendant's passing argument that no good faith basis exists for Parcel Partners' allegations regarding its damages because Parcel Partners offers no factual dispute for its alleged damages of $5,000,000 and because Parcel Partners' damages are limited as stated in the Limitation of Liability provision are meritless. However, as Defendant seems to imply, such argument is not appropriate in a motion to dismiss.

Under Pennsylvania law, "[a] cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Corestates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).[4] "A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent." *State v. Bruun*, 2017 UT App 182, ¶ 24, 405 P.3d 905. Only unambiguous contracts are construed as a matter of law. *Id.* "However, if the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, the contract's interpretation becomes a question of fact, and extrinsic evidence must be looked to in order to determine the intentions of the parties." *Id.* (internal quotation marks omitted). "A contract is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Id.*

In this case, Defendant seeks to dismiss Parcel Partners' Complaint solely on the grounds that the Agreement's language—specifically that in Sections 1.E., 2.E., and 10B—does not expressly state that an "exclusive relationship" exists between Parcel Partners and Defendant and, therefore, Defendant cannot have breached any duty to Parcel Partners. However, absent

[4] Defendant suggests that the Agreement's Governing Law provision, which provides that Pennsylvania law governs any dispute between the parties, is unenforceable under Utah's choice-of-law rules, but concedes that no conflict-of-laws analysis is necessary because the elements of Pennsylvania's and Utah's breach of contract action are substantially similar. (Mot. at n.7.) For the purposes of its opposition only, Parcel Partners does not object to the application of Utah law. *See* Bair v. Axiom Design, L.L.C., 2001 UT 20, ¶ 14, 20 P.3d 388. ("The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.")

any exclusivity provision, Defendant's obligations become illusory, as it could slowly move all of its volume off of Parcel Partners' NSA without consequence, terminating the Agreement and necessarily becoming Parcel Partners' competitor. As the Agreement contains no express language that Parcel Partners intended this result, Defendant's interpretation is unreasonable and inconsistent with the parties' expectations and purpose of the Agreement. Therefore, Defendant's Motion should be dismissed.

### A. When Viewed as a Whole, the Agreement's Implied Terms Create an Exclusive Relationship Between Parcel Partners and Defendant for Domestic Shipping Rates.

Defendant argues that based on the absence of any express language in the Agreement creating an exclusive relationship between Defendant and Parcel Partners regarding the offer of discounted USPS domestic shipping rates to Defendant's clients, no such exclusive relationship existed. However, it is axiomatic that "[i]n contract interpretation, the court must first look to the whole contract to discern the parties' intentions." *Goodwin v. Hole No. 4, LLC*, No. 2:06-cv-00679, 2006 U.S. Dist. LEXIS 86157, at *8 (D. Utah Nov. 15, 2006). "The established rules of contract interpretation require consideration of each of its provisions in connection with the others and, if possible, to give effect to all." *Minshew v. Chevron Oil Co.*, 575 P.2d 192, 194 (Utah 1978). "Effect is to be given the entire agreement without ignoring any part thereof." *Id.* Defendant does not dispute this long-standing principle of contract interpretation. (Mot. at 15.) Instead, Defendant impermissibly asks this Court to ignore this principle and focus solely on the language contained in Section 1.E.

However, courts "interpret the terms of a contract in light of the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose

of the contract." *Peirce v. Peirce*, 2000 UT 7, ¶ 19, 994 P.2d 193. To that end, "courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract." *Id.* Thus, when doubt arises regarding interpretation of a contract, the court will prefer a "fair and equitable result" over a "harsh and unreasonable one." *Id.* A court will only adopt an interpretation creating an inequitable result when the contract "expressly and unequivocally so provides that there is no other reasonable interpretation to be given it." *Id.*

Moreover, with respect to bilateral contracts supported by mutual promises as consideration, "the promises must be binding on both parties." *Id.* at ¶ 21. When only a "facade of a promise" exists, "such promise is said to be illusory." *Id.* Under these circumstances, "the tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract." *Id.* Thus, in the absence of express contrary restrictions, courts will interpret contracts to include "implied promises to prevent a party's promise from being performable merely at the whim of the promisor." *Id.*

The Utah Supreme Court's decision in *Peirce*, as well as this Court's decision in *Goodwin*, are instructive. In *Peirce*, the court considered a husband and wife's written contract regarding the disposition of property. *Peirce*, 2000 UT 7, ¶ 2, 994 P.2d 193. In the contract, the husband agreed to leave "his estate to [the wife] at his death" in exchange for the wife's promise to give "all of her paychecks to [the husband], keeping only a small amount of spending money for personal use." *Id.* Two months before his death, the husband left the wife, moved in with his nephew, and made "four gratuitous conveyances of real property and shares of stock to defendants." *Id.* at ¶ 4. After her husband's death, the wife filed an action for constructive trust against the defendants, claiming that the husband had impermissibly conveyed property to them

in violation of the contract. *Id.* at ¶ 5. The wife argued that "the terms of the writing implicitly required [the husband] to obtain her consent before he conveyed any of his property." *Id.* The court rejected the defendants' argument that "absent any express term to the contrary, [the husband] was legally entitled to make gratuitous transfers of property prior to his death." *Id.* at ¶ 25. Instead, the court found that "[a]bsent any restriction upon his ability to transfer his property by will, gift, or otherwise, [the husband] would have given no consideration . . . because it would permit [the husband] to arbitrarily avoid performance of his side of the bargain." *Id.* at ¶¶ 26-27. Therefore, the court held that the agreement contained an implied limitation to gratuitously transfer substantial portions of his property. *Id.* at ¶ 28.

This Court in *Goodwin* reached a similar conclusion. In *Goodwin*, two buyers contracted with a residential developer to purchase a single-family unit within a planned residential community. *Goodwin*, 2006 U.S. Dist. LEXIS 86157, at *2-3. The real estate contract at issue, however, limited buyers to return of the buyer's deposit with ten percent interest in the event of a seller default. *Id.* at *5. As the community's development progressed, property values increased, leading the developer to terminate the real estate contract on that bases that it construed the contract's termination clause "to afford it the option to terminate the [contract] for any reason upon tender to the 'Buyer' of a return of all deposits plus interest thereon at the rate of ten percent per annum[.]" *Id.* at *5-6. The buyers sued for, among other things, breach of contract. *Id.* at *6. Relying on the Utah Supreme Court's decision in *Peirce*, this Court rejected the developer's interpretation that the termination provision gave it "an absolute and unconditional power to terminate the contract at any time[.]" *Id.* at *11. Instead, to preserve the overall purpose of the contract, this Court reasonably "construe[d] the contract as including an

implied term limiting the effect of [the termination clause] to unintentional defaults." *Id*. Any other interpretation would have given the developer "the right to define the nature and extent of its performance, a result which would make its promise illusory." *Id.* at *12.

Similar to *Peirce* and *Goodwin*, Defendant's interpretation of Section 1.E.—and the definition of "Competing Reseller"—would give Defendant the unfettered ability to negotiate its own NSA with the USPS for domestic shipping rates, thereby allowing it to refer merchants to its own NSA rather and off of Parcel Partners' NSA. Defendant argues that the Agreement does not prohibit it from offering its merchants "alternative discounted USPS domestic shipping rates from Shopify's own NSA with USPS." (Mot. 12-13.) However, such an interpretation is inconsistent with the parties' purpose and expectations for entering into the Agreement—Parcel Partners' offer of discounted USPS domestic shipping rates to Defendant's merchants under Parcel Partners' NSA. (Compl. ¶ 12; Mot. at ¶ 5.) Defendant fails to explain the purpose of the Agreement's three year term if it could, at any time and without notice, move its merchants to its own negotiated USPS NSA. Thus, Defendant's interpretation of "Competing Reseller" would allow it to effectively terminate the Agreement at any time. For this reason, exclusivity is an implied term of the Agreement. And Defendant's arguments regarding the lack of any express language creating an exclusive relationship is meritless.

Moreover, such an interpretation would allow Defendant to move all of its merchants off of Parcel Partners' NSA onto Defendant's NSA while avoiding the consequences of Section 10B's Termination for Convenience clause. Defendant argues that Section 10B applies in the absence of exclusivity if Defendant terminated the Agreement to offer its merchants USPS discounted domestic shipping rates from a reseller other than Defendant. (Mot. at 16.)

However, Defendant's interpretation is unreasonable because it would permit Defendant to terminate the Agreement without paying the requisite $650,000 Termination Payment. Defendant fails to explain why it would be liable for the Termination Payment if it terminated the Agreement to move its merchants to the NSA of a reseller other than itself, but not if Defendant moved its merchants to its own NSA.

Thus, a more reasonable interpretation of the definition of "Competing Reseller"[5] is that it created an exclusive relationship by prohibiting Defendant from obtaining its own NSA with the USPS and referring its merchants to Defendant's discounted domestic shipping rates. (Compl. ¶ 23.) The Agreement's definition of "Competing Reseller" contemplates two categories of third parties: (1) resellers of USPS rates, similar to Parcel Partners' relationship to Defendant under the Agreement, and (2) other parties that offer shipping rates pursuant to a reseller's NSA. (*Id.* at ¶ 20.) "Competing Reseller" makes no distinction with respect to "negotiated service agreements with the USPS" and makes no distinction regarding the party holding the NSA. (*Id.* at ¶ 22.) Therefore, the Agreement carves out Defendant from "Competing Reseller" because by providing shipping rates to its customers under Parcel Partners' NSA, Defendant would otherwise fall under the second category of resellers. (*Id.*at ¶ 21.)

Despite Defendant's argument to the contrary, Section 2.E. supports the existence of an exclusive relationship between Parcel Partners and Defendant for domestic shipping rates.

[5] Section 1.E. of the Agreement defines "Competing Reseller" as "a third party, other than [Defendant] that offers shipping rates under negotiated service agreements directly with the USPS for domestic or international rates." (Compl. ¶ 18.)

Section 2.E. provides that Parcel Partners "acknowledges and agrees that [Defendant] may offer Clients competing products and offerings from Competing Resellers, *or directly from the USPS*, for: (i) international USPS rates, (ii) international USPS rates that including a USPS domestic rate as a component of the international USPS rate, (iii) domestic USPS rates on first class parcels." (Agreement at § 2.E.) (emphasis added). Therefore, Section 2.E. expressly lists the services Defendant is permitted to offer merchants directly from the USPS. Notably absent from this list is USPS domestic shipping rates. Had the parties intended to permit Defendant to offer merchants discounted domestic shipping rates under its own NSA, the parties could have included this in Section 2.E. The fact that such permission is absent from this section reflects the parties' intent to create an exclusive relationship between Parcel Partners and Defendant for the offering of discounted domestic shipping rates.

Defendant's argument that Section 2.E does not prohibit Defendant from offering discounted USPS domestic shipping rates to merchants because the arguments appear in Section 2.E. is meritless. Other than the heading title—"Company Agrees"—Defendant offers no persuasive reason why the permissions outlined in Section 2.E. are any less applicable to Defendant because they appear in Section 2.E. rather than Section 1.E.. Indeed, Section 2.E. does not contradict Section 1.E. Therefore, Section 2.E. supports an implied term of exclusivity between Parcel Partners and Defendant for the offering of discounted USPS domestic shipping rates.

**CONCLUSION**

For the foregoing reasons, Parcel Partners respectfully requests this Court enter an order denying Defendant's Motion.

DATED this 1st day of September 2020.

/s/ Jason D. Boren
Jason D. Boren, Esq.
Nathan Marigoni, Esq.
BALLARD SPAHR LLP
*Attorneys for Plaintiff Parcel Partners, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct of copy of the foregoing **MEMORANDUM IN OPPOSITION TO DEFENDANT SHOPIFY INC.'S MOTION TO DISMISS THE COMPLAINT** was served to the following this 1st day of September 2020, in the manner set forth below:

[ x] Through the CM/ECF System for the U.S. District Court

[ ] Hand Delivery

[ ] U.S. Mail, postage prepaid

[ ] E-mail: hgoebel@gapclaw.com; rtrummel@kslaw.com

Heidi G. Goebel
GOEBEL ANDERSON PC
405 South Main Street, Suite 200
Salt Lake City, UT 84111

Rachael M. Trummel
KING & SPALDING LLP
353 North Clark Street, 12th Floor
Chicago, IL 60654

/s/ Lisa D. Brown